IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| MERLIN A. CONNOLLY and MAUREEN A. CONNOLLY, individually and as Administrator of the Estate MERLIN A. CONNOLLY, SHARON MOONEY AND LISA CHANDLER; | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Civil Action No.:   2:14-CV-00152 |
| WYETH-AYERST LABORATORIES, INC.; SANDOZ PHARMACEUTICALS CORPORATION; NOVARTIS PHARMACEUTICALS CORPORATION; TEVA PHARMACEUTICALS USA INC.; BARR LABORATORIES, INC. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

## COMPLAINT

**COMES NOW**, MERLIN A. CONNOLLY, herein referred to as "Plaintiff", in the above numbered and styled case, and complains of, WYETH, NOVARTIS, SANDOZ, and TEVA PHARMA, herein collectively called "Defendants", and for cause of action will show to the Court as follows:

## I.     PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Merlin A. Connolly was a 66- year-old resident of Oakwood in Hall County, Georgia.   Merlin Connolly died at Northeast Georgia Medical Center in Huntsville on July 10, 2012.

2.      Plaintiff Maureen Connolly is a resident of Oakwood in Hall County, Georgia. Maureen Connolly is the widow of the Merlin Connolly, and the executor of Mr. Connolly's estate.

3.      Plaintiff Sharon Mooney is a resident of Oakwood in Hall County, Georgia. Sharon Mooney is the daughter of the deceased Merlin Connolly.

4.      Plaintiff Lisa Chandler a resident of Gainesville in Hall County, Georgia. Lisa Chandler is the daughter of the deceased Merlin Connolly

5.      Defendants named in this Complaint include all of their predecessor entities and their entire past and present component, subsidiary, and affiliate entities.

6.      Defendants Wyeth-Ayerst Laboratories, Inc. is a New Jersey corporation maintaining its principal place of business in Madison, New Jersey. These Defendants conducts substantial, systemic, continuous, and regular business in Georgia.

5.      Defendant Teva Pharmaceuticals USA, Inc., (hereinafter "Teva") is a Delaware corporation with a principal place of business in Pennsylvania. Defendant regularly conducts business in New Jersey.  Defendant was and is involved  in the  manufacture, distribution, marketing, sale, labeling, and design of amiodarone in the State of Georgia and throughout the United States as detailed below.

6.      Defendant Barr Laboratories, Inc., upon information and belief, is a Delaware corporation with its principal place of business in New Jersey. Defendant Barr Laboratories, Inc. was acquired by Defendant Teva Pharmaceuticals USA, Inc. on December 23, 2008 and is a wholly owned subsidiary of Defendant Teva Pharmaceuticals USA, Inc. Defendant Barr Laboratories, Inc. regularly conducts business in Georgia and

throughout the United States and is involved  in the  manufacture, distribution, marketing, sale, labeling, and design of amiodarone as detailed below.

7.     At all material times, upon information and belief, each Defendant authorized and/or acted by and through its officers, employees, agents, servants, and/or representatives, including those actively engaged in the legal defense of Defendants.

8.     At all material times, every reference made to any corporate Defendant in this Second Amended Complaint includes predecessors, successors, parents, subsidiary, affiliates, and divisions of the corporation for the corresponding time period.

9.     Whenever reference is made to any act, deed, or transaction of Defendants, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the corporation's management, direction, control, or business affairs.  Any Defendant that is a subsidiary of a foreign parent acted as its parent company's agent for its parent's U.S. sales.

10.    Venue is proper pursuant to §28 U.S.C. §81 and §91 because a substantial part of the events or omissions giving rise to the claim occurred within the State of Georgia.  The injuries at issue in this lawsuit occurred in the State of Georgia.

11.    Defendants conduct business in the.  Defendants' commercial activities in the include, but are not limited to, the marketing, sale and distribution of Cordarone®, Pacerone®, and their generic equivalent, amiodarone.

## II. **STATEMENT OF CASE**

12.    Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 11 above as if restated and realleged in full herein.

13.     Deceased, MERLIN A. CONNOLLY is an individual who resided in Oakwood, Georgia. The cause of action is brought on behalf of the estate of Merlin Connolly by the executer Maureen Connolly, and on behalf of the Individual Plaintiffs Maureen Connolly, Sharon Mooney and Lisa Chandler, who reside in, Oakwood, Georgia, Oakwood, Georgia, and Gainesville, Georgia. Plaintiff Merlin Connolly was prescribed, purchased, and ingested the drug Amiodarone (described more fully herin), which was manufactured and/or sold or distributed by Defendants and as a proximate, Merlin Connolly suffered severe and debilitating injury to his pulmonary system resulting in his slow and painful death as a result of taking said drug, and hereby files this complaint as a result of Defendants wrongful conduct.

14.     Plaintiff Merlin Connolly. suffered from Bilateral infiltrates and Amiodarone pulmonary toxicity and death as the direct result of consuming a product, Amiodarone, which was manufactured, supplied, sold, and distributed by the Defendants.

15.     Amiodarone is sold with the National Drug Code (hereinafter "NDC") Number 00555-0917-09 as AMIODARONE HYDROCLORIDE TABLETS and other names, manufactured and distributed by Defendants. Prescription, medical records and the NDC Number of the tablets prescribed and ingested by Plaintiff all confirm Plaintiff consumed Amiodarone.

16.     Plaintiff was diagnosed with Artrial fibrillation.

17.     Defendants' scheme in the past involved and continues to involve a calculated and deceitful sales campaign, and equally egregious failure and refusal to take required, timely, and accurate corrective actions and notice to medical professionals to prevent catastrophic injury and death to its customers, such as Merlin Connolly.

18.     Defendants, like many other drug companies, spend billions of dollars each year trying to persuade doctors to prescribe their particular drugs. There are, however, strict FDA regulations about the form and content of such promotion. In fact, it is unlawful for a manufacturer to promote any drug for a use not described in the approved labeling of the drug. 21 U.S.C. §§ 331(d), 352(f), and 355.

19.     The purpose of this federal requirement is to protect patients by ensuring drug manufacturers will subject prospective uses of their drugs to randomized and well-controlled clinical trials to determine whether the drug is safe and effective for such uses, at least where sufficient promise lies to make the cost of trials worth incurring. These requirements are meant to ensure that drug companies like Defendants give physicians and medical personnel trustworthy information, so that medications are prescribed appropriately.

20.     A manufacturer's duty to test a use arises, under both common law and federal law, when the manufacturer, such as the Defendants, learns of any adverse events concerning its sale of Amiodarone.

21.     As described in further detail herein, in 1985, the initial manufacturer and distributer in the United States, Wyeth, received FDA approval to market and sell Amiodarone only as a drug of last resort for patients suffering from documented recurrent life-threatening ventricular fibrillation and ventricular tachycardia; and further, only when these conditions would not respond to other available anti-arrhythmic drugs and therapies.

22.     After Wyeth received FDA approval, however, some companies, such as Defendants, and their hired agents, embarked on a course of conduct, the purpose of which was

to increase Amiodarone sales as an initial, first-line anti-arrhythmic medication, for which Amiodarone has never received FDA approval, i.e., and "off-label" use.

23.     The Amiodarone manufacturers and suppliers, knew of the extreme dangers and catastrophic injuries and death caused by Amiodarone - - known through adverse events reporting customer and physician communications, and other sources - - which existed for years when Defendants entered the market for Amiodarone.

24.     Upon information and belief, the Defendants recognized a significant profit potential in the dangerous off-label promotion and sale of Amiodarone as a first-choice cardiac drug for non-life threatening heart ailments.

25.     The Defendants tracked and had full knowledge of the number of prescriptions written for Amiodarone to be given as a first-line cardiac drug, and have, through various means designed to conceal their involvement, promoted and conspired together and with others to promote the use of Amiodarone as an initial, first-line therapy for arrhythmia and other heart ailments. These Defendants decided to avoid the normal regulatory process of the FDA pertaining to the marketing of a new use of a drug and to proceed in illegal fashion. The decision was also made to actively conceal the illegal means that would be used to market the drug.

26.     Defendants' scheme was implemented so Defendants could tap into the enormous market for Amiodarone in the United States. Ultimately, Defendants' actions proved successful.

27.     Upon information and belief, and at all material times hereto, Defendants were aware from multiple sources, that many of Defendants' Amiodarone prescriptions were, and are currently, written for off-label purposes.

28.     Defendants' scheme, described in more detail below, ultimately deceived physicians, pharmacists, and consumers into believing that prescribing and taking Amiodarone for the off-label uses that Defendants promoted was appropriate even though Defendants knew FDA approval had not been granted for those uses and, moreover, there was significant medical-scientific evidence suggesting Amiodarone was very dangerous in those situations, and in fact, resulted in serious pulmonary illness and toxicity, and death, when so used.

### III.     Factual Background

29.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 28 above as if restated and realleged in full herein.

30.     All prescription drugs require approval by the Food and Drug Administration (hereinafter "FDA") before the drug may be marketed.  Manufacturers of new drugs must submit a new drug application (hereinafter "NDA") to the FDA. An NDA must include information about the drug's safety and efficiency gleaned from clinical trials.[1] It must also propose a label reflecting appropriate use, warnings, precautions, and adverse reactions.[2]

31.     For generic drugs, Congress passed the Drug Price Competition and Patent Term Restoration Act in 1984.  This statute amended the Food, Drug, and Cosmetic Act (hereinafter "FDCA") and is referred to as the Hatch-Waxman Amendments to the FDCA.  The Hatch-Waxman Amendments provided an "abbreviated new drug application" (hereinafter "ANDA") procedure for generic manufacturers.[3]  Generic manufacturers are not required to repeat the clinical trials conducted by name brand manufacturers.  ANDA's are approved based on the initial safety profile of the name brand drug and are subject to all post-marketing events and

---

[1] 21 U.S.C. § 355(a)-(b).
[2] 21 C.F.R. § 201.56
[3] 21 U.S.C. § 355(j).

post-sales events, including, but not limited to, collecting, tracking, and reporting adverse
incident reports regarding the drug.

32.     In 1985, Defendant Wyeth received FDA approval to market and sell the anti-
arrhythmic heart medication Cordarone® (amiodarone hydrochloride is the generic formulation)
under a special "needs" approval without the usually mandated rigorous and FDA approved,
randomized clinical trials.   Although the FDA has urged Wyeth to conduct randomized clinical
trials, such trials have not been conducted.  The FDA approval for Cordarone® remains a special
and unusual "special needs" approval.   The customary and rigorous randomized clinical trials
now required by the FDA for all new drug applications have not been conducted.  Wyeth was the
initial manufacturer and distributor or "brand manufacturer" of Cordarone® in the United States.

33.     Wyeth's Cordarone® was approved as a drug of last resort for patients suffering
from documented recurrent life-threatening ventricular fibrillation and ventricular tachycardia
when these conditions would not respond to other available anti-arrhythmic drugs and therapies.
Wyeth also aggressively and successfully marketed Cordarone® for "off-label" uses as a "first
line anti-arrhythmic therapy."

34.     Defendant Wyeth's fraudulent and misleading marketing campaigns resulted in
warning letters from the FDA to stop the false and misleading promotion of the drug that
downplayed the risks and promoted the drug as a first line anti-arrhythmic therapy.[4]  The FDA
letters noted that it is unlawful for a manufacturer to promote any drug for a use not described in
the approved labeling of the drug.[5]  The purpose of this federal requirement is to protect patients
by ensuring drug manufacturers subject prospective uses of their drugs to randomize and well-
controlled clinical trials to determine whether the drug is safe and effective for such uses. These

---

[4] Warnings by the FDA to Wyeth began as early as 1988.  http://www.mcclatchydc.com/2003/11/04/28118/fda-
oversight-of-off-label-drug.html
[5] *See* 21 U.S.C. §§ 331(d), 352(f), and 355

requirements are meant to ensure that drug companies like Defendants give physicians and medical personnel trustworthy information so that medications are prescribed appropriately. Physicians may still prescribe drugs for unapproved uses. These uses are deemed "off-label" because they have not been approved by the FDA. (A pharmaceutical company is permitted to disseminate certain information about off-label uses, but such dissemination must adhere to strict requirements. For instance, the manufacturer must submit an application to the FDA seeking approval of the drug for off-label use; the manufacturer must provide its marketing materials to the FDA prior to dissemination; the materials must be in unabridged form; and the manufacturer must include disclosures that the materials pertain to an unapproved use of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically sound information . . . necessary to provide objectivity and balance."[6] The dissemination of information in violation of these provisions violates the Food, Drug and Cosmetic Act (hereinafter "FDC Act").[7] This law also requires pharmaceutical companies to furnish federal regulators with advance copies of the information they disseminate.[8] Any deviation from these requirements violates FDA regulations.)

35. Defendants Teva and Barr received approval for the manufacture, marketing, sale and distribution of the generic formulation amiodarone hydrochloride in 1998.[9] As with all generic bioequivalent approvals, Defendants Teva and Barr were required by the FDA to provide patients prescribed the drug with all FDA approved labels, warnings and medication guides with

---

[6] 21 U.S.C. § 360aaa, *et seq*
[7] 21 U.S.C. § 331(z)
[8] 21 U.S.C. § 360aaa
[9] The approval letter noted on the FDA database is addressed to Copley Pharmaceutical, Inc. and dated November 30, 1998. http://www.accessdata.fda.gov/drugsatfda_docs/anda/98/74-739_Amiodarone_Approv.pdf

information exactly as required of the brand formulation manufacturer, Wyeth, and as updated as directed by the FDA. [10]

36.     Plaintiff Merlin Connolly was diagnosed with atrial fibrillation which was manageable and was not deemed life threatening.  Merlin Connolly was not in a medical situation of "last resort" as to the management of his atrial fibrillation.

37.     In May of 2010, Dr. Lalitha Medepalli prescribed Merlin Connolly a 90-day course of 200mg amiodarone tablets for treatment of Merlin Connolly's atrial fibrillation, following the removal of cancer in his left lung. Merlin Connolly's surgery to remove the cancer from his lungs went as planned and there were no remaining signs of cancer, or life threatening conditions affecting his lungs. Merlin Connolly filled the prescription on May 12, 2010 and ingested the drug amiodarone according to instructions.  Merlin Connolly was not aware that his use of the medication was for an "off-label" use and, as noted above, he was not in a situation of last resort as to his atrial fibrillation.  Correction of atrial fibrillation was never an FDA approved use of Cordarone® and Merlin Connolly's prescription was for an "off-label" use.

38.     Merlin Connolly was not provided the Medication Guide[11] or the appropriate and up to date warning labels that were required to be given to Merlin Connolly to warn him of the serious side effects of amiodarone.  The Defendant manufacturers, Teva and Barr were responsible for ensuring that the appropriate warning labels and Medication Guide were provided to Merlin Connolly.  Had he been provided the Medication Guide, Merlin Connolly would have

---

[10] *See* 21 U.S.C. § 355(j)(2)(A)(v); § 355(j)(4)(G).

[11] The FDA requires that Medication Guides be issued with certain prescribed drugs and biological products when the Agency determines that certain information is necessary to prevent serious adverse effects; patient decision-making should be informed by information about a known serious side effect with a product, or patient adherence to directions for the use of a product are essential to its effectiveness. http://www.fda.gov/Drugs/DrugSafety/ucm085729.htm

been aware of the serious lung related side effects that could lead to death as well as other issues and he would not have taken amiodarone.

39.     The serious side effects outlined in the Medication Guide, all of which Merlin Connolly experienced after taking amiodarone, included lung damage, shortness of breath, wheezing, trouble breathing, coughing, tiredness, weakness, nervousness, irritability, restlessness, decreased concentration, and depression.[12]

40.     Because he was not provided a Medication Guide, Merlin Connolly did not know that amiodarone "should only be used in adults with life-threatening heartbeat problems called ventricular arrhythmias" and even then when "other treatments did not work or were not tolerated."[13]  He did not know that any other use such as the use for his atrial fibrillation was considered to be "off-label" and Merlin Connolly did not know of the corresponding dangers associated with such uses.

41.     Because he was not provided a Medication Guide, Merlin Connolly did not know "the medicine stays in your body for months after treatment is stopped."[14]  The effects of amiodarone are long lasting.  Amiodarone is fat-soluble, and tends to concentrate in tissues including fat, muscle, liver, lungs, and skin and confers a high volume of distribution and a long half-life; the amount of time it takes for one-half of an administered drug to be lost through biological processes (metabolism and elimination).  Because of this long half-life, amiodarone's dangerous properties continue to cause injuries in patients long after they have ceased using the drug, including, serious pulmonary injuries.  This information was unknown to Merlin Connolly.

42.     Each manufacturer who ships a container of drug product for which a Medication Guide is required is responsible for ensuring that Medication Guides are available for

---

[12] Medication Guide for amiodarone HCI.  http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152841.pdf
[13] Medication Guide for amiodarone HCI.  http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152841.pdf
[14] Medication Guide for amiodarone HCI.  http://www.fda.gov/downloads/Drugs/DrugSafety/UCM152841.pdf

distribution to patients.[15]  Defendants are manufacturers as defined by the FDA.  The FDA has

recognized that "it is important that patients receive appropriate risk information in the form of

Medication Guides in order to make informed decisions about certain prescribed medications."

The FDA has expressed concern at the failure of drug manufacturers in distribution of the

Medication Guides and that "the current Medication Guide program is too cumbersome and that

it lacks a standard distribution system."

43.    The National Consumer Pharmacy Association has identified the failure of

manufacturers to ensure the distribution of Medication Guides as a significant safety issue and

called on the FDA to "enforce current FDA MedGuide regulations holding manufacturers

accountable for providing Medication Guides in sufficient number or the means to produce

Medication Guides in sufficient number, to permit the authorized dispenser to provide a

Medication Guide to each patient who receives a prescription for the drug product.[16]   Merlin

Connolly did not receive a Medication Guide.

44.    In the May of 2010, Merlin Connolly began to experience many of the symptoms

outlined in the Medication Guide to include shortness of breath, wheezing, trouble breathing,

coughing, tiredness, weakness, nervousness, irritability, restlessness, decreased concentration,

and depression.

45.    From May 2010 to July 2012, Merlin Connolly underwent a continuous and

constant struggle against the side effects of Amiodarone. Merlin Connolly experienced extreme

fatigue and weakness which affected every part of his daily routine, and shortness of breath

which made even walking across the room a monumental task. Finally he was forced to deal with

---

[15] *See* 21 CFR § 208.24
[16] Use of Medication Guides to Distribute Drug Risk Information to Patients, Colleen Brennan, RPh; Bryan Ziegler, PharmD, MBA

his respiratory system completely failing and shutting down due to the toxicity from the Amiodarone in his system.

46.     During the period that Merlin Connolly was prescribed and took the drug Amiodarone, he experienced symptoms of shortness of breath, productive cough, which eventually produced signs of blood, longer than normal healing of wounds, paler than normal pigment of skin, and signs of gaunt, sunken in cheeks and face.

47.     Merlin Connolly died on July 10, 2012.  At the time of his death, Merlin Connolly was a 66-year-old resident of Oakwood, Georgia.

### A. Cordarone®, Concealment, And The Off-Label Promotional Scheme By Defendant Wyeth

48.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 47 above as if restated and realleged in full herein.

49.     As noted above, on or about December 24, 1985, Defendant drug manufacturer Wyeth introduced Cordarone® into the United States' stream of commerce.  Wyeth received approval for Cordarone® from the FDA only as a drug of last resort for patients suffering from documented recurrent life-threatening ventricular fibrillation and ventricular tachycardia; and further, only when these conditions would not respond to other available anti-arrhythmic drugs and therapies. Pacerone was introduced by Defendant Upsher-Smith in 1998 under the same approval guidelines by the FDA as for Cordarone.

50.     The FDA's early specific enforcement actions regarding the marketing and labeling of the drug Cordarone®, include:

        a.      On or about October 7, 1986:  label revision;

        b.      On or about May 15, 1987:  label revision;

        c.      On or about August 7, 1987:  package change;

d.      On or about October 28, 1987:  manufacturing changes;

e.      On or about June 29, 1988:  label revision;

f.      On or about September 14, 1988:  label revision;

g.      On or about December 13, 1988:  package change;

h.      On or about February 2, 1989:  label revision;

i.      On or about July 28, 1989:  formulation revision;

j.      On or about August 9, 1990:  label revision;

k.      On or about August 9, 1990:  manufacturing change;

l.      On or about April 14, 1994:  label revision;

m.      On or about October 15, 1995:  label revision;

n.      On or about June 15, 1998:  label revision;

o.      On or about January 5, 1999:  label revision;

p.      On or about October 8, 1999:  label revision;

q.      On or about December 18, 1999:  label revision;

r.      On or about September 20, 2002:  control supplement;

s.      On or about December 18, 2002:  label revision;

t.      On or about April 30, 2003:  label revision;

u.      On or about May 6, 2003:  label revision;

v.      On or about May 21, 2004:  label revision.

51.     On or about December 15, 1989, and subsequently in 1992, 1998, and thereafter,

the FDA sent violation communications to Wyeth regarding the FDA's determination that Wyeth

had violated the Act and its implementing regulation by, *inter alia*, disseminating false and

misleading materials to physicians and the public without adequate risk information concerning

the use of Cordarone®.  Wyeth misrepresented Cordarone's® indications and usage, efficacy, risks, and benefits.  Further, Wyeth intentionally failed to submit marketing materials to the FDA in violation of the Act.

52.     Upon information and belief, in May of 1995, the Australian Government's Therapeutic Goods Administration (that country's counterpart to the U.S. FDA), issued an Australian Adverse Drug Reactions Bulletin, emphasizing that Amiodarone was appropriate only for use in the treatment of ventricular and supraventricular arrhythmias.  Notably, this Bulletin highlighted that "the drug [Amiodarone] is known to have multiple adverse effects, which can involve most organ systems," and again stressed that "Amiodarone is only to be used in patients with serious arrhythmias where there is no safer drug therapy."

53.     Upon information and belief, on or about April 29, 1996, the FDA required Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the following:

        a.     Carcinogenesis;

        b.     Mutagenesis;

        c.     Impairment of fertility, pregnancy;

        d.     Neonatal hypo- or hyperthyroidism.

54.     Upon information and belief, the severity of catastrophic adverse reactions, including death, led Wyeth to discontinue production and distribution of Cordarone® in Canada on or about September 10, 1996.

55.     Upon information and belief, on or about February 11, 1997, the FDA issued a warning letter to Wyeth regarding Cordarone's® understated or incorrect labeling and warnings based on the FDA's medical research.  Thereafter, on or about April 16, 1997, Wyeth changed its

labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the following:

     a.    Loss of vision;

     b.    Impairment of vision, including optic neuritis, optic neuropathy, corneal lesions, lens opacities, optic disk damage, papilledema, retinal hemorrhage and degeneration, photophobia;

     c.    Liver injury;

     d.    Pregnancy;

     e.    Adult Respiratory Distress Syndrome;

     f.    Angioedema;

     g.    Mortality.

56.     Upon information and belief,  in 1998 the FDA issued a Written Request for Pediatric Studies under Section 505A of the Act to Wyeth regarding Cordarone®.  Upon information and belief, the basis for this request was that insufficient tests, surveys, and studies had been conducted regarding Cordarone® consumption by pediatric patients, although there was knowledge by Defendants and other drug manufacturers and in the medical community that off-label use of Cordarone® in pediatric patients was being more and more common.

57.     Upon information and belief, in 1998 the FDA issued a letter to Wyeth requiring that company to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the following:

     a.    Mortality (based upon the European Infarct Amiodarone Trial and Canadian Myocardial Infarct Trial);

     b.    Precautions regarding volatile anesthetic agents for Amiodarone users undergoing surgery;

     c.    Carcinogenesis;

d.      Mutagenesis;

e.      Impairment of fertility, pregnancy;

f.      Neonatal hypo- or hyperthyroidism.

58.     Upon information and belief, Wyeth's sales and promotional practices for Cordarone®, included that on or about December 6-10, 1998, Wyeth sponsored a CME for the 33rd Midyear Clinical Meeting of the American Society of Health-System Pharmacists.  This CME was for healthcare providers, including pharmacists, as part of Defendant's ongoing promotion of Cordarone® for off-label purposes.  As part of the CME, Wyeth produced and distributed to attendees, a 68-page official looking, peer review-appearing magazine, "The Pharmacist Reporter (July 1999, Vol. 4, No. 5)."  This publication was actually a promotional bulletin highlighting Wyeth's goal for Cordarone®:  increased off-label use.  Among the topics addressed in various articles in "The Pharmacist Reporter," several of which appear to soften, downplay, and/or minimize Cordarone's® devastating side effects, were the following:

a.      "An Aggressive Treatment Strategy for Atrial Fibrillation";

b.      "Use of Amiodarone in Patients Undergoing Cardiothoracic Surgery";

c.      "A Possible New Standard of Care for Prehospital Cardiac Arrest."

59.     On or about October 8, 1999, the FDA issued a letter to Wyeth requiring Defendant Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the following:

a.  Clinical pharmacology and pharmokinetics, in that food consumption increases Cordarone's® absorption rate;

b.  Geriatric use, whereby clinical studies of Cordarone® in persons 65 and older had not been conducted;

c.  Dosage and administration, in that food consumption must be addressed in dosing and loading doses are to be used.

60.     On or about January 12, 1999, the FDA issued a letter to Wyeth requiring Defendant Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding Geriatric use, whereby clinical studies of Amiodarone in persons 65 and older had not been conducted.

61.     On or about February 12, 1999, the FDA issued a letter to Wyeth requiring Defendant Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the effects of food consumption on dosage and administration.

62.     Defendant Wyeth was affected by the February of 2002 Australian Government's Therapeutic Goods Administration (hereinafter "TGA") issuance of an Australian Adverse Drug Reactions Bulletin, alerting healthcare professionals in that country that numerous adverse medical events associated with Cordarone® had been reported to the TGA in 2002 and 2001, including Cordarone-induced pulmonary toxicity and deaths.  The TGA warning contained the following important information for healthcare professionals:

> "Although commonly insidious in onset, amiodarone—induced pulmonary toxicity may develop rapidly.  The lowest effective dose should be used, and patients should be instructed to report any dysponea or non-productive cough. Amiodarone also has other toxicities including hepatotoxicity which can cause cirrhosis and hepatic failure, cardiovascular effects including bradycardia and tachycardia, skin reactions including photosensitivity and discolouration, neurotoxicity including ataxia and peripheral neuropathy, as well as both corneal deposits and hyper- and hypothyroidism."

63.     On or about December 18, 2002, the FDA issued a letter to Wyeth requiring Defendant Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding adverse drug interactions with immunosuppressant static drugs, resulting in rhabdomyolysis.

64.     On or about December 19, 2002, the FDA issued a warning letter to Wyeth requiring Defendant to correct understated warnings and/or issue new warnings regarding the following:

      d.  Acute onset (days to weeks) of pulmonary toxicity;

      e.  Patients having preexisting pulmonary disease have poorer prognosis if pulmonary toxicity develops;

      f.  Post-marketing reports include possible fatal respiratory disorders (including distress, failure, arrest, ARDS, fever, dyspnea, cough, hemoptysis, wheezing, hypoxia, and pulmonary infiltrates).

65.     In 2003, the FDA issued a warning letter to Wyeth, requiring Defendant Wyeth to change its labeling, warnings, and packaging for Cordarone®; specifically, adding new warnings or revising minimalist warnings regarding the following:

      g.  worsened arrhythmia;

      h.  thyroid abnormalities;

      i.  drug interactions (protease inhibitors, histamine antagonists, immunosuppressives, antibiotics, cardiovasculars, anti-arrhythmics, anti-hypertensives, anticoagulants);

      j.  other substance (grapefruit juice, herbal supplements) interactions;

      k.  electrolyte disturbances; and

      l.  nursing mothers passing the drug to newborns through breast milk.

66.     Optic neuropathy is an under reported adverse side effect of Cordarone®.

67.     It was known to Defendant Wyeth, that Cordarone® use had resulted in vision loss and permanent blindness.

68.     Wyeth had previously been forced by the Canadian Government to change the drug's labeling in Canada.

69.     In addition, upon information and belief, Defendant Wyeth's pharmaceutical sales and marketing directors encouraged their respective sales representatives to visit physicians' offices throughout the United States to promote and over promote the drug for off-label use, such as atrial fibrillation.  Wyeth's realized more than Three Billion ($3,000,000,000) in sales for "off- label" uses of Cordarone®.

70.     To date, despite changing the warnings and labeling for Cordarone® multiple times over the past 25 years and the requirement for the distribution of Medication Guides to all patients, and knowing of numerous catastrophic injuries caused by Cordarone®, Wyeth continues to understate the drug's nature and adverse risks of catastrophic injury, pulmonary injury and death.

71.     Defendant Wyeth was on notice, by no later than 1998, that severe damage to the lungs were side effects of the ingestion of Cordarone® which can cause permanent injury and death.

72.     In 2003, the FDA sent violation communications to Wyeth regarding the FDA's determination that Defendants had violated the Act and its implementing regulation by, *inter alia*, disseminating false and misleading materials to physicians and the public without adequate risk information concerning the use of Cordarone® by children and pregnant women. Thereafter, these Defendants notified physicians to stop prescribing Cordarone® to children and pregnant women because of the serious risk of permanent injuries.

73.     Defendant Wyeth misrepresented Cordarone's® indications and usage, efficacy, risks, and benefits.  Further, Defendant Wyeth intentionally failed to submit marketing materials to the FDA in violation of the Act.

74.     At all material times, Defendant Wyeth willfully failed and refused to actively and affirmatively monitor Cordarone's® "off-label," unapproved uses insofar that such uses caused catastrophic injuries and death.  Defendant Wyeth, however, continued to promote Cordarone® for unapproved uses.  Such promotion had direct beneficial results for generic Defendants as well.

**B.     Facts Common To All Counts And All Defendants**

75.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 74 above as if restated and realleged in full herein.

76.     At all material times, Defendants, respectively, jointly and severally, have had actual or constructive knowledge that Cordarone® and amiodarone cause and contribute to severe and disabling medical conditions and death, such as those experienced by Merlin Connolly, including, without limitation, the following:  pulmonary toxicity, pulmonary fibrosis, hepatic damage and failure, neurotoxicity, neonatal hypothyroidism, birth defects, optic neuritis, toxic optic neuropathy, blindness, peripheral neuropathy, heart damage and failure, hypotension, serious exacerbation of arrhythmias, and congestive heart failure.

77.     Upon information and belief, Defendants, respectively, jointly and severally, have received information concerning more than one thousand deaths resulting from the use of Cordarone®/amiodarone.

78.     Upon information and belief, Defendants, respectively, jointly and severally, have received information concerning cases of severe medical conditions resulting from the use of Cordarone®/amiodarone, including, without limitation, pulmonary toxicity, pulmonary fibrosis, lung damage, hepatic damage and failure, neurotoxicity, peripheral neuropathy, neonatal

hypothyroidism, optic neuritis, toxic optic neuropathy, blindness, serious exacerbation of arrhythmias, and congestive heart failure such as that experienced by Merlin Connolly.

79.     Healthcare providers, as well as patient-consumers reported these events, upon information and belief, directly to the company.

80.     In addition to these direct notices of adverse events, the FDA had, and continues to have, in effect, an adverse reaction surveillance system for all regulated drugs, including Cordarone®/amiodarone, called the Adverse Event Reporting System (AERS).

81.     Upon information and belief, the AERS has placed these Defendants on notice of numerous instances of catastrophic injuries caused by ingestion of Cordarone®/amiodarone.

82.     At all material times, Defendants failed to disclose to the FDA, healthcare professionals, consumers, or Merlin Connolly, of the information they possessed concerning the incidents and actual adverse medical events, injuries, and deaths suffered by Cordarone®/amiodarone users.  Instead, upon information and belief, these Defendants actively promoted, or piggy-backed the promotional efforts of innovator drug manufacturer Wyeth, Cordarone® for "off-label," unapproved uses as described herein through various means, including, but not limited to, the following:

     m.  Direct-to-physician and direct-to-pharmacist promotion through sales representatives;

     n.  Promotion through funding and manipulation of so-called "educators" who organize and arrange continuing medical education (CME) courses for physicians and pharmacists;

     o.  Formulation of unlawful conspiracies with certain medical marketing and medical "education" entities to promote – without appearing to promote – off-label uses;

     p.  Sponsorship and funding of the production of CME materials;

q. Cultivation and development of so-called "opinion leaders" in local medical communities and support for the careers and research of those physicians, pharmacists, and researchers who advocate off-label uses;

r. Sponsorship of journal supplements and symposia on off-label uses for Cordarone®;

s. Placing (through sponsorship of limited trials, studies, and surveys) of medical literature databases showing positive effects (already established) on risk factors with the twin purposes of overwhelming any independent study showing negative effects on different risk factors, and causing earnest but time-crunched physicians to be impressed with the sheer quantity of favorable (but redundant) studies on MedLine, or medical library, search;

t. Media advertisements and brochures, some of which were disguised as "educational materials";

u. Various other forms of marketing and promotion.

83.     Upon information and belief, in accepting the benefits Wyeth efforts in promoting "off-label" uses of Cordarone® by sponsoring CME conferences and materials, journal supplements, redundant trials, and the work and careers of favorably disposed opinion leaders, Defendants would sometimes escape disclosure for any role at all in the presentation of its desired view.

84.     Additionally, upon information and belief, Sandoz and Novartis Defendants's and/or its agents' pharmaceutical sales representatives actively promoted their generic amiodarone in the stream of commerce for the "off-label" uses openly promoted by Defendant Wyeth.

85.     At other times, Defendants would be disclosed merely as having provided an "unrestricted educational grant" for seminars when in fact the grant was premised on an understanding about the content or otherwise Defendants exercised influence over it.

86.     At all materials times, despite FDA warnings and thousands of adverse patient experiences, Defendants continued their fraudulent marketing, promotional, and sales practices from 1999 through the present date.

87.     At all material times, which Defendants, respectively, jointly and severally, concealed information about catastrophic injuries and death, and thousands of serious adverse medical events from the FDA, health care professionals, and consumers, including Robert Dreher Sr.

88.     At all material times, the Cordarone®/amiodarone manufactured and/or supplied by Defendants was and is unaccompanied by proper warnings regarding all possible adverse side effects and comparative severity and duration of such adverse effects; the warnings given did not and do not accurately reflect the severity or duration of the adverse side effects or the true potential and/or likelihood or rate of the side effects.  This is particularly so with regard to "off-label" use.

89.     At all material times, Defendants failed to warn of material facts regarding the safety and efficacy of Cordarone®/amiodarone, such that this drug would likely have never been approved, and no physician would have been able to prescribe this drug for use in the United States.

90.     At all material times, Defendant Wyeth failed to perform adequate testing in that adequate testing would have shown that Cordarone® possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope, and severity should have been made with respect to the use of Cordarone®, particularly for "off-label" use.

91.     For example, although Defendants knows, should have known, and currently knows that the majority of patients consuming Cordarone®/amiodarone are senior citizens, including those aged 55 and over such as Merlin Connolly, Defendant Wyeth has failed and refused to conduct testing, studies, surveys, and/or report the results of same regarding Cordarone® use in this age group.

92.     At all material times, the Cordarone®/amiodarone manufactured, distributed, and/or supplied by Defendants was defective due to inadequate post-marketing warning and instruction because, after Defendants knew or should have known of the risk of injury from Cordarone®/amiodarone, especially in "off-label" use, Defendants failed to provide adequate and required warnings to physicians, users or consumers of Cordarone®/amiodarone, including the plaintiff Merlin Connolly, and continued to aggressively sell Cordarone®/amiodarone, including for "off-label" use.

93.     At all material times, while Defendants, respectively, jointly and severally, concealed this adverse event information, they simultaneously engaged in a massive and fraudulent marketing and promotional scheme in which they aggressively and fraudulently promoted Cordarone®/amiodarone for uses never authorized by the FDA.  In fact, Defendants marketed, promoted, and "pushed" Cordarone®/amiodarone, not as a drug of last resort, but as a drug suitable as an initial therapy and to treat non-life-threatening heart conditions.

94.     At all material times, Defendants respectively, jointly and severally, also promoted Cordarone®/amiodarone for heart conditions less severe than life-threatening ventricular arrhythmia (the only purpose for which the drug originally received FDA approval).

95.     Defendants engaged in a conspiracy of silence regarding "off-label" use, choosing to market and promote the drug for "off-label" use, and then feigning ignorance before the FDA,

health care providers, and consumers.  They failed and refused to conduct thorough testing on the side effects, despite knowing that their scheme to promote the drug for "off-label" uses had been, and continues to be, successful.

96.     Defendants have engaged in this calculated and coordinated silence despite their knowledge of the growing public acceptance of misinformation and misrepresentations regarding both the safety and efficacy of the use of Cordarone®/amiodarone, and did so because the prospect of significant future profits outweighed their concern regarding health and safety issues, all to the significant detriment of the public and Merlin Connolly.

97.     At all material times, Defendants's affirmative misrepresentations and omissions have so infected the market in the United States that physicians and consumers relied on Defendants' fraud, respectively, to the detriment of their patients and themselves.

98.     Under increased FDA scrutiny and mandates, the Wyeth Defendant, respectively, has been forced to correct and change their warning labels, and add new warnings, for Cordarone® for adverse side effects about which they knew long before being required to make such changes.

99.     Nevertheless, at all material times, the warnings for Cordarone®/amiodarone in effect during the relevant time period were vague, incomplete, and/or otherwise wholly inadequate, both substantively and graphically, to alert prescribing physicians, pharmacists, consumer patients and Merlin Connolly of the actual risks associated with this drug.

100.    At all material times, Defendants' deception, concealment, and fraudulent marketing and promotion has been so pervasive throughout the United States, that prescribing physicians and consumer patients have during the relevant time period still believe that Cordarone®/amiodarone is an acceptable initial, secondary, or otherwise early-stage anti-

arrhythmic intervention. These deceptive techniques served (and continue to serve) Defendants in several ways, including: (1) instilling Defendants' desired view about the drug's "off-label" uses among health care providers; (2) Defendants hoped that, by concealing its agency in these activities, they would escape the legal ramifications of its unlawful promotional activities; and (3) boost Defendants' profits for the drug.

101. At all material times, Defendants, and each of them respectively, jointly, and severally, owed a duty to the health care providers, consumer patients, and Merlin Connolly herein, to engage in honest and non-deceptive practices; exercise due care under the circumstances, to exercise due care in the design, manufacture, marketing, promotion, sale, and distribution of Cordarone®/amiodarone; to provide a reasonably safe and non-defective drug; to provide adequate and appropriate warnings for said drug; to comply with federal guidelines, rules, and regulations; and/or to sell and distribute the drug in accordance with FDA restrictions.

102. At all material times, Defendants marketed Cordarone®/amiodarone as having approval, characteristics, uses, and benefits that the drug did not have.

103. At all material times, Defendants respectively, jointly and severally, did design, create, test, develop, label, sterilize, package, manufacture, market, promote, advertise, distribute, sell, warn, and/or otherwise caused the product to be placed into the stream of commerce, and ultimately to be ingested by Merlin Connolly.

104. At all material times, Defendants willfully failed and refused to actively and affirmatively monitor Cordarone®/amiodarone's "off-label," unapproved uses insofar that such uses caused catastrophic injuries and death. Defendants however, continued to sell Cordarone®/amiodarone for unapproved uses.

105.     At all material times, Defendants, respectively, jointly and severally, engaged in a continuing course of fraud, concealment, material nondisclosure and omission, upon Plaintiffs which prevented Plaintiffs from knowing or having reason to know of Defendants' misconduct.

### C.     Amiodarone Did Not Undergo The Rigorous FDA Approval Process Required For Federal Preemption

106.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 105 above as if restated and realleged in full herein.

107.     As noted above, on or about December 24, 1985, Defendant drug manufacturer Wyeth introduced Cordarone® into the United States' stream of commerce.  Wyeth received approval for Cordarone® from the FDA only as a drug of last resort for patients suffering from documented recurrent life-threatening ventricular fibrillation and ventricular tachycardia; and further, only when these conditions would not respond to other available anti-arrhythmic drugs and therapies. Furthermore, despite repeated requests by the FDA at the outset of the approval process and throughout the history of the drug, neither Wyeth, Upshaw-Smith the maker of the "other" brand name version of amiodarone or the generic drug manufacturers of the product have submitted the drug to the rigorous randomized clinical trials required for FDA drug approval.

108.     Amiodarone as the drug is commonly known was developed in Belgium in the 1960's as a drug for treating a common heart condition known as angina. At that time, Amiodarone was released for marketing in most countries OTHER than the United States.

109.     Use of amiodarone as a drug "with little side effects" became widespread except in the United States. In the 1970's American Doctors began obtaining Amiodarone from Canada and Europe for use in their patients with life-threatening arrhythmias who did not respond to other drugs. This activity was sanctioned by the FDA on a limited basis. Initial results were promising and by the mid-1980's literally tens of thousands of Americans were taking the drug

without FDA approval or testing. American doctors apparently monitored the conditions of their patients more rigorously than their colleagues around the world because they found the drug produced a bizarre series of side effects that doctors around the world seemed to have missed and that were not caught because of the lack of testing or randomized trials.

110.    The FDA was essentially forced to release amiodarone for marketing in the United States by the mid-1980's when foreign manufacturers of the drug threatened to cut off the supply to Americans after having supplied the drug for free to thousands of Americans for over five years. American doctors convinced the FDA this would result in a medical disaster.

111.    As a result, unlike any other drug in modern history -Amiodarone became FDA approved without rigorous, FDA sanctioned randomized clinical trials. The legal reasons for preemption applied to drug litigation for FDA approved drugs are not present in Amiodarone.

112.    Amiodarone has been determined to affect many different organs in many ways. First, the drug takes many weeks to achieve the maximum effectiveness. Amiodarone is literally "stored" in most of the tissues of the body and to "load" the body with the drug all the tissues need to be saturated. Therefore, the typical loading regimen of amiodarone is to use extremely large dosages of the drug for the first week to two weeks then to taper the dosage over the next month. It is not unusal to give a patient 1200 to 1600 mg dosage a day when starting the drug and to maintain the patient on as little as100 to 200 mg per day on a chronic basis.

113.    Amiodarone leaves the body slowly. The drug is not excreted like most drugs through the liver or kidney but is only lost when amiodarone containing cells such as skin cells or cells from the GI tract or lost. Therefore, even when it is decided that the patient needs to stop taking amiodarone the drug remains in the system in measurable quantities for months.

114.    Maybe most importantly, because the drug is stored in many different types of tissues it can cause side effects that affect many different types of organs. Some of the side effects take months to years to develop so constant diligence is needed.

115.    Amiodarone causes many horrific side effects that have resulted in its restricted use in the United States including; causing blindness, it causes deposits to form on the cornea of the eyes, a condition in virtually everyone who takes the drug; amiodarone causes a very disfiguring blue-grey discoloration of the skin, generally in areas of exposure to the sun; amiodarone often sensitizes the skin to sunlight so that even trivial exposure results in severe sunburns; amiodarone causes hypothyroidism-low thyroidism, -a condition relatively easy to treat with thyroid medication. Some patients develop hyperthyroidism-high thyroid, which is more dangerous and more difficult to treat. Amiodarone can cause liver toxicity; therefore, liver enzymes need to be monitored periodically. Amiodarone can cause severe gastric reflux, caused by a paralysis of the sphincter at the end of the esophagus.

116.    The most serious side effect of amiodarone and the one requiring the patient Medication guide is pulmonary toxicity-lung disease. Amiodarone produces two types of lung disease-first, acute pulmonary syndrome which looks and acts like typical pneumonia, with a sudden onset of cough and shortness of breath, a condition that rapidly improves once the amiodarone is stopped. The second type is more dangerous. This condition involves a gradual, almost unnoticeable stiffening of the lungs that both the doctor and patient overlook until finally severe irreversible lung damage is done. This condition can occur quickly after the taking of the drug or can occur years after the drug has begun. Lung toxicity has been found by the FDA to be 17% and fatalities from pulmonary toxicity have been found to be 10% of those taking the drug. These statistics come from those taking the drug for conditions the drug is not approved for-

arterial fibulation, as well as the ventricular condition it is approved for as a drug of last resort after other treatments have been tried and have failed.

117.    Amiodarone never underwent the rigorous randomized trials all other FDA approved drugs other than a few "grandfathered" drugs with long market histories have undergone. Despite repeated requests, demands and even threats from the FDA the manufacturers of amiodarone and its FDA labeled "brand-names" Wyeth's Cordarone and Upshaw Smith's Pacerone, have never undergone the type of clinical trials that would show its defects or the benefits vs. the risks associated with the drug's use. Despite the economic argument that the patent has expired, or that the costs of testing is too high to justify the investment amiodarone continues to generate enormous revenues for the drug manufacturers without the public having the protection of FDA randomized clinical trials.

118.    The only trials amiodarone underwent were non-scientific,reporting of a combination of various patient results combined to obtain statistical data that is neither randomized or reliable and which interestingly enough did not even provide the statistical data that has been determined by the FDA to be accurate for the drug and required in the black box labeling of the product. Obviously, this combination of reporting of various patients was non-scientific and cannot serve as the basis for a claim of preemption.

119.    Without rigorous, scientific, clinical trials and randomized testing approved by the FDA the reasons for FDA preemption do not exist and cannot be sustained. Neither the so-called 'brand names" or the generic versions of the drug offer any protection to the public from the FDA approval process. Since the manufacturers will not undergo FDA approved testing they cannot use the FDA approval process as a shield from liability when sued. None of the reasons articulated by the United States Supreme Court for the protection preemption provides are

present with amiodarone. None of the costs benefits analysis is present. In addition, none of the regulatory analysis argument and certainly no Federalism argument are present to support preemption.

120.     This is not to say the FDA completely disregarded its regulatory or enforcement powers regarding Amiodarone. While no testing justifying preemption was ever performed, when the statistical evidence of the dangers of Amiodarone and its many side effects became known, the FDA repeatedly amended the labeling requirements for Amiodarone, mostly resulting from public pressure and for just the sixtieth time in regulatory history enacted a requirement that the drug manufacturer directly provide the patient a FDA approved "Medication Guide." along with the drug. Due to the failure to conduct required randomized clinical testing by the Defendants, Plaintiff is not preempted from claiming the Defendants illegally marketed the product for off-label use, and is not preempted from claiming that the product itself is unreasonably dangerous as it was packaged, marketed, designed, manufactured and sold. Most importantly, Plaintiff is not preempted from claiming Defendants failed to warn of the dangers of the product by failing to provide the FDA required "Medication Guide" consisting of ONLY language the FDA approved to go directly to the patient. The failure to provide the FDA "Medication Guide" is a stronger claim than merely alleging the package insert or labeling fails to inform or warn patients or consumers of the dangers of the product. The failure to provide each patient a "Medication Guide" is a direct violation of the FDA's mandate to the manufacturers of the drug intended to warn patients of the very dangers that killed Robert Dreher, Sr.

## IV.      Cause of Action

### A.      Negligence/Wrongful Death (Federal)

121.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 120 above as if restated and realleged in full herein.

122.     Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully set forth herein.

123.     The death of Merlin Connolly was directly and proximately caused by the negligent actions of the Defendants as related to the manufacture, marketing, distribution and sale of Cordarone®/Amiodarone as described herein.

### B.      Survivor's Action for Injuries and Damages Prior to Death

124.     Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 123 above as if restated and realleged in full herein.

125.     As set forth here and above, Merlin Connolly endured profoundly debilitating and painful injuries to his person as a result of ingesting Amiodarone.

126.     The injuries he received caused him to suffer conscious pain and agony prior to his death. Pulmonary toxicity, the condition resulting in Merlin Connolly's death, is a side effect of Amiodarone and is a progressively more painful condition. It became more difficult for Merlin Connolly to breathe as the condition progressed until death was caused by suffocation or by his lungs filling with fluids, both of which resulted in a slow, painful death.

127.     As a direct and proximate result of these injuries, Merlin Connolly incurred and there were incurred on his behalf by his estate monetary damages in excess of $10,000.00 for medical treatment and medications.

128.    Merlin Connolly's estate and survivors are entitled to recover an award of damages for his conscious pain and suffering prior to death, for his personal injuries prior to death as aforesaid, for actual, special, general, and punitive damages, or including, without limitation, medical expenses, funeral expenses, past wages and benefits, attorney's fees, and interest and costs.

### C.    Loss of Consortium

129.    Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 128 above as if restated and realleged in full herein.

130.    Plaintiff's wife and widow claims damages for loss of support, loss of services, loss of consortium and society, loss of love and affection, and loss of advice and care in matters material, moral, and spiritual, as well as the prospects thereof and for the funeral, burial, and related expenses occasioned by the death of Merlin Connolly.  Plaintiff's children Sharon Mooney and Lisa Chandler, claim damages for loss of support, loss of services, loss of consortium and society, the continuing care, guidance and advice that a parent provides to his children throughout their lives.

### VI.    Demand For Jury Trial

131.    Plaintiffs restate and reallege the allegations set forth in paragraphs 1 through 130 above as if restated and realleged in full herein.

132.    Plaintiff in the above-styled case hereby demands a trial by jury of all issues so triable as a matter of right.

**WHEREFORE,** Plaintiff, demands judgment against each Defendant, individually, jointly and severally for compensatory damages, together with applicable interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

WHEREFORE, Plaintiff prays as follows:

1. That process issue and that the Defendants be served as provided by law;

2. That she have a non-jury trial by the Court of all non-jury issues and a trial by jury of all issues triable by jury;

3. That she recover compensatory damages and judgment for the full value of the life of her husband based upon his wrongful death;

4. That she recover compensatory damages and judgment for her husband's personal injuries and conscious pain and suffering before his death;

5. That she, as Administrator of the Estate of Merlin A. Connolly, obtain judgment for all expenses;

6. That she recover special damages to be proven at trial;

7. That she recover punitive damages pursuant to O.C.G.A. §51-12-5.1, in an amount sufficient to punish and deter Defendants from any such similar conduct in the future;

8. That she recover attorney's fees and expenses of litigation pursuant to O.C.G.A. §13-6-11, based upon the Defendants' bad faith, stubborn litigiousness, and causing her unnecessary trouble and expense;

9. That she recover all reasonable and necessary expenses; and

10. That she recover such other and further relief and the Court deems just and equitable.

This the  10th  day of July, 2014.

                                   Respectfully Submitted,

                                   /s/ Sean R. Kasper
                                   Sean R. Kasper
                                   Georgia Bar Number: 408555
                                   sean@seankasper.com

Sean R. Kasper, P.C.
PO Box 991
Brunswick, GA 31521
(912) 342-7191 (telephone)
(912) 342-7194 (facsimile)

                                   Todd C. Brooks
                                   Georgia Bar Number: 085550
                                   toddbrooks@cattslaw.com
                                   Austin E. Catts
                                   Georgia Bar Number: 116900
                                   aec@cattslaw.com
                                   *Attorneys for Plaintiff*

Catts and Brooks, LLC
1529 Reynolds Street
Brunswick, Georgia 31520
912-261-8448 (telephone)
912-261-7919 (facsimile)

**OF COUNSEL:**

**E. KIRK WOOD**                             **JUSTIN L. WILLIAMS**
**MICHAEL E. GURLEY, JR.**               **COLE, COLE & EASLEY, P. C.**
**WOOD LAW FIRM, LLC**                   719 S. Shoreline, Suite 200
P. O. Box 382434                                Corpus Christi, Texas 78401
Birmingham, Alabama 35238-2434          Telephone: (361) 885-0184
Telephone:  (205) 612-0243                Facsimile: (361) 579-4435
Facsimile:  (866) 747-3905
ekirkwood1@bellsouth.net                  jlwilliams@cce-vic.com
mgurleyjr@yahoo.com                      pwendt@cce-vic.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

|  |  |  |
|---|---|---|
| MERLIN A. CONNOLLY and MAUREEN A. CONNOLLY, individually and as Administrator of the Estate MERLIN A. CONNOLLY. | ) ) ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| vs. | ) ) | Civil Action No.: |
| WYETH-AYERST LABORATORIES, INC.; SANDOZ PHARMACEUTICALS CORPORATION; NOVARTIS PHARMACEUTICALS COPRORATION; TEVA PHARMACEUTICALS USA INC.; BARR LABORATORIES, INC. | ) ) ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## REQUEST FOR SERVICE BY CERTIFIED MAIL

Pursuant to FRCP 4.1 and 4.2, Plaintiff request service of the foregoing Complaint by certified mail.

## SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:

Wyeth-Ayerst Laboratories, Inc.
5 Giralda Farms
Madison, New Jersey 79401

Sandoz Pharmaceuticals Corporation
506 Carnegie Center Drive
Princeton, NJ 08540

Novartis Pharmaceuticals Corporation
1000 S. Pine Island Road
Plantation, FL 33324

Teva Pharmaceuticals USA, Inc.
c/o Ms. Jennifer Fuller-Ricciardi
Teva Pharmaceuticals USA, Inc.
425 Privet Road
P. O.Box 1005
Horsham, PA 19044

Barr Laboratories, Inc. a Division
    of Teva USA, Inc.
c/o Ms. Jennifer Fuller-Ricciardi
Teva Pharmaceuticals USA, Inc.
P. O. Box 1005
425 Privet Road
Horsham, PA 19044

This the 10th day of July, 2014.

Respectfully Submitted,

/s/ Sean R. Kasper